```
 1                UNITED STATES DISTRICT COURT
                    DISTRICT OF MINNESOTA
 2
     ------------------------------------------------------------
 3                                    )
     Clement B. Darkenwald; The       )   File No. 24-cv-4231
 4   Clement and Idona Darkenwald     )           (JWB/SGE)
     Family Limited Partnership;      )
 5   and Darkenwald & Sons            )
     Management Company, Inc.,        )   St. Paul, Minnesota
 6                                    )   March 4, 2025
             Plaintiffs,              )   2:12 p.m.
 7                                    )
     vs.                              )
 8                                    )
     D&Y Partners, LLC; The D&Y       )
 9   Family Limited Partnership;      )
     The John and Tonya Darkenwald    )
10   Family Limited Liability         )
     Limited Partnership; The John    )
11   F. Darkenwald Revocable Trust    )
     UAD June 26, 1986; The George    )
12   and Deborah Yankoupe Family      )
     Limited Partnership; The         )
13   Gilbert R. Darkenwald Family     )
     Limited Partnership; George      )
14   Yankoupe; Deborah Yankoupe;      )
     The Estate of John F.            )
15   Darkenwald; Gilbert R.           )
     Darkenwald; Casey Darkenwald;    )
16   Darkenwald Corporation; and      )
     Tonya Darkenwald,                )
17                                    )
             Defendants.              )
18   ------------------------------------------------------------

19          BEFORE THE HONORABLE JERRY W. BLACKWELL
                UNITED STATES DISTRICT COURT JUDGE
20
                       (MOTION HEARING)
21

22

23
             Proceedings recorded by mechanical stenography;
24   transcript produced by computer.

25
```

```
 1    For the Plaintiffs:       Winthrop & Weinstine
                                ABIGAIL SOKOLOWSKI, ESQ.
 2                              DEVON HOLSTAD, ESQ.
                                GERALD H. FORNWALD, ESQ.
 3                              Suite 3500
                                225 South Sixth Street
 4                              Minneapolis, Minnesota 55402

 5    For the Defendants D&Y    Taft Stettinius & Hollister LLP
      Partners, LLC, and The    JASON R. ASMUS, ESQ.
 6    D&Y Family Limited        JORDAN WEBER, ESQ.
      Partnership:             2200 IDS Center
 7                              80 South Eighth Street
                                Minneapolis, Minnesota 55402
 8
      For the Defendants The    Dorsey & Whitney LLP
 9    George and Deborah        DANIEL J. BROWN, ESQ.
      Yankoupe Family Limited   LUKE WETTERSTROM, ESQ.
10    Partnership, George       Suite 1500
      Yankoupe, and Deborah     50 South Sixth Street
11    Yankoupe:                 Minneapolis, Minnesota 55402

12                              DANIEL N. ROSEN, ESQ.
                                Suite 300
13                              5201 Eden Avenue
                                Edina, Minnesota 55436
14
      For the Defendants The    Larkin Hoffman Daly & Lindgren
15    John and Tonya            Ltd.
      Darkenwald Family         R. HENRY PFUTZENREUTER, ESQ.
16    Limited Liability         Suite 1000
      Limited Partnership,      8300 Norman Center Drive
17    The John F. Darkenwald    Minneapolis, Minnesota 55437
      Revocable Trust UAD
18    June 26, 1986, The
      Estate of John F.
19    Darkenwald, and Tonya
      Darkenwald:
20
      For the Defendants The    Entrepartner Law Firm, PLLC
21    Gilbert R. Darkenwald     MICHAEL R.J. MERGENS, ESQ.
      Family Limited            Suite 235
22    Partnership, Gilbert R.   635 Ninth Street NE
      Darkenwald, Casey         Minneapolis, Minnesota 55414
23    Darkenwald, and
      Darkenwald Corporation:
24

25
```

1    Court Reporter:          ERIN D. DROST, RMR-CRR
                              Suite 146
2                             316 North Robert Street
                              St. Paul, Minnesota 55101
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

1
2
3
4          THE COURT:  Please be seated.

5          Please go ahead and call the case.

6          THE COURTROOM DEPUTY:  We are here on the matter

7   of Clement D. Darkenwald, et al. v. D&Y Partners, LLC, et

8   al.  Case Number 24-cv-4231 JWB/SGE.

9          THE COURT:  Will the parties note their

10  appearances starting with plaintiffs' counsel.

11         MR. FORNWALD:  Good afternoon, Your Honor.  Gerry

12  Fornwald from Winthrop and Weinstein.  I'm joined at counsel

13  table by Abby Sokolowski, and also joined by Devon Holstad

14  of our firm and Clement Tom Darkenwald.

15         THE COURT:  All right.  Good afternoon.

16         MR. FORNWALD:  Good afternoon, Your Honor.

17         THE COURT:  And for the defense.

18         MR. ASMUS:  Good afternoon, Your Honor.  Jason

19  Asmus and Jordan Weber from the Taft firm representing the

20  two D&Y entity defendants.

21         THE COURT:  Good afternoon.

22         MR. BROWN:  Good afternoon, Your Honor.  Dan Brown

23  from Dorsey & Whitney on behalf of the Yankoupe defendants.

24  And with me, Luke Wetterstrom is in the courtroom as well

25  today.

1          THE COURT:  Say that name again.

2          MR. BROWN:  Luke Wetterstrom.

3          THE COURT:  All right.

4          MR. ROSEN:  Daniel Rosen also for the Yankoupe

5     defendants.

6          THE COURT:  All right.

7          MR. PFUTZENREUTER:  Good afternoon, Your Honor.

8     Henry Pfutzenreuter with the law firm Larkin Hoffman.  I'm

9     here on behalf of the J&T defendants, which are the John and

10    Tonya Darkenwald Family Partnership; John Darkenwald's

11    estate, his trust; and Tonya Darkenwald.

12         THE COURT:  All right.

13         MR. MERGENS:  Good afternoon, Your Honor.  Michael

14    Mergens, Entrepartner Law Firm, on behalf of the Casey

15    defendants, which is Casey Darkenwald, Darkenwald

16    Corporation, Gilbert R. Darkenwald, and the Gilbert R.

17    Darkenwald Family Limited Partnership.

18         THE COURT:  Yeah, you were on in your car on our

19    first call, weren't you?

20         MR. MERGENS:  I was, Your Honor, yes.

21         THE COURT:  I remember.  Okay.  Good afternoon to

22    all of you.

23         We're here on a motion to dismiss, and I am going

24    to tell you what I think of it.  And so the purpose of the

25    hearing is going to be to see if I think the same thing at

1    the end as I think here at the beginning.  And it may

2    shorten some of the arguments too.  At least it will focus

3    the arguments.  I don't know if any of you ever have cause

4    to practice in California, but I did quite a bit, even

5    though here.  But it was a common thing in state court to

6    get preliminaries, and I always appreciated them.  It did

7    focus the arguments, and you knew whether you were on a good

8    road or at least if you weren't, you knew what you were up

9    against, and I appreciated having them.

10            So this is a very brief preliminary because the

11   road ends probably at the end of this hearing, and I'll

12   decide whether I think the same thing or not when it's over.

13            So here goes.  This dispute stems from a

14   longstanding kerfuffle over governance, control and

15   financial management of family-owned business entities.  At

16   the center of it are D&Y Family Limited Partnership, D&Y

17   FLP, and its general partner D&Y Partners LLC, D&Y LLC,

18   entities engaged in real estate investment and management.

19            Plaintiffs Clement, that's Clem Darkenwald, and

20   his family-held business, Clem and Idona -- and I apologize

21   for mispronouncing the names -- but Clem and Idona FLP,

22   contend that family members and affiliated business entities

23   intentionally schemed to consolidate power and exclude him

24   from his proper role in governance over the D&Y enterprises

25   through improperly amending company agreements and by

misallocating financial distributions and commissions to their own favored entities.

Plaintiffs assert allegations under the Racketeer Influenced and Corrupt Organizations Act, RICO, along with various state law causes of action. In fact, RICO is the sole federal claim before me. Defendants move to dismiss the RICO claim under Rule 12(b)(6) for failure to state a claim.

So for the punch line, plaintiffs do not, in my estimation, meet the pleading requirements for a RICO claim. The alleged predicate acts of mail and wire fraud do not satisfy requirements to plead fraud. The allegations also do not demonstrate a pattern of racketeering activity, a distinct RICO enterprise, or a direct causal link between the alleged misconduct and plaintiffs' claimed injury. The RICO claim again is the only basis for federal jurisdiction.

The remaining state law claims, which involve issues of corporate governance, contract interpretation, and fiduciary duties under Minnesota law are suitable for resolution in state court.

Therefore, as I will explain further in just a moment, the defendants' motion to dismiss the RICO claims will be granted, and this Court declines to exercise supplemental jurisdiction over the state law claims.

By way of background, plaintiffs' father initiated

the complaint on November 19th, 2024, followed by an amended

complaint the next day asserting 12 counts, including a RICO

claim.  Plaintiffs also moved for a temporary restraining

order and preliminary injunction claiming immediate harm

from Clem's exclusion from governance and alleged financial

mismanagement by defendants.

At a November 24th -- sorry -- 25th, 2024, status

conference, this Court identified pleading deficiencies in

the amended complaint, particularly with respect to the RICO

claim, and dismissed it under Federal Rule of Civil

Procedure 8(a) for failure to provide a short and plain

statement of the claims.  The plaintiffs were granted leave

to amend.  And on December 16th, 2024, they filed a Second

Amended Complaint reducing the number of claims to 11 but

keeping the RICO -- keeping RICO in as the only federal

cause of action.

By way of background, Gilbert and Billie

Darkenwald had four children:  Clem, John, Gilbert -- who

goes by Gil -- and Deborah.  In 1995, Gilbert and Billie

formed D&Y FLP, a holding company for several family real

estate properties.  These properties now include

agricultural land that includes a single family home, that

is the farmhouse; a family cabin; and a commercial and

industrial building, the Midway Plaza.

Along with the formation of the D&Y FLP, Gilbert

1    and Billie entered into a partnership agreement that

2    regulates D&Y FLP Partners, including requirements for

3    transfer of any partners' interest and amending the

4    partnership agreement.  The partnership interest in D&Y FLP

5    were divided equally between Gilbert and Billie's four

6    children's FLPs:  Clem and Idona FLP for one; two, John and

7    Tanya FLLLP; three, Gil FLP; and, four, George and Deborah

8    FLP.

9          In November 2006, D&Y LLC was formed and appointed

10   general partner of D&Y FLP.  Clem, John, and Gil were equal

11   members.  The three of them entered into a member control

12   agreement and operating agreement and shared equal voice

13   with respect to operation of the D&Y LLC.  I'm simply here

14   taking what's alleged in the Second Amended Complaint.

15         In March 2010, D&Y LLC retained Clem's company,

16   Darkenwald & Sons Management Company, to provide management

17   services for the Midway Plaza and appointed Clem as D&Y

18   LLC's chief manager and CEO.

19         According to the Second Amended Complaint,

20   governance changes implemented in 2021 and 2022 by a series

21   of written actions altered the structure of the D&Y entities

22   depriving Clem of his authority and placing control in the

23   hands of his siblings' entity, the John and Tanya Darkenwald

24   Family Limited Liability Limited Partnership, J&T FLLLP.

25   Casey, John and Tanya's son, was appointed an advisory board

seat on the board.  Clem's position as the chief manager of
D&Y LLC and the Darkenwald & Sons property management
contract, well, they were terminated, as was Clem's partial
lease on the family-owned cabin and his lease interest in
the farmhouse.

Casey's company, Darkenwald Corporation, was
appointed as the new asset management company.  Amendments
were also made to the operating agreements of both D&Y FLP
and D&Y LLC, which then allowed for Gil to transfer his
interest in both entities to John and Tanya FLLLP.

Plaintiffs assert that the amendments through
written actions were enacted unilaterally without Clem's
knowledge and in violation of existing agreements.  With
Clem and his companies iced out of all D&Y decision-making,
plaintiffs alleged defendants embarked on a pattern of
racketeering activities to deplete the assets of D&Y FLP and
fraudulently funnel money and assets to select recipients.

D&Y FLP entered into an asset management agreement
with Darkenwald Corporation, to which D&Y FLP agreed to pay
Darkenwald Corporation $15,000 per month, plus a commission
if D&Y FLP sold or refinanced any of its real estate assets.

Then, D&Y FLP sold the Midway Plaza for over
4.6 million in proceeds, of which $46,083 was paid to
Darkenwald Corporation as a commission.

Following the sale of the Midway Plaza, defendants

allegedly directed a disproportionate share of the sale's
profits to themselves and affiliated entities to the
exclusion of Clem and his affiliates.  Plaintiffs allege
defendants used electronic communications and mail services
to facilitate and conceal their actions.  They also allege
that they have been deliberately denied access to critical
financial records that would reveal the extent of the
exclusion from rightful distributions.

Now heading into the discussion, under
Rule 12(b)(6), I am to accept as true a complainant's
factual allegations and draw all reasonable inferences in
the plaintiffs' favor.  Although the plaintiffs' factual
allegations need not be detailed, they must be sufficient to
raise a right to relief above the speculative, per *Twombly*
and *Iqbal*, and to state a claim of relief that's plausible
on its face.  In assessing a claim's plausibility,
conclusory allegations must be disregarded.

So turning first to the RICO claim,
Section 1962(c) of Title 18 makes it unlawful for any person
employed by or associated with any enterprise engaged in
interstate commerce to conduct or participate, directly or
indirectly, in the conduct of such enterprise's affairs
through a pattern of racketeering activity.

Despite this broad language, RICO does not cover
all wrongdoing.  Rather, it is a unique cause of action that

1    is concerned with eradicating organized long-term habitual

2    criminal activity.  To plead a viable RICO claim, a

3    plaintiff must allege, number one, conduct; two, of an

4    enterprise; three, through a pattern; four, of racketeering

5    activity.  When the alleged racketeering activity is fraud,

6    the predicate acts must be pleaded with particularity under

7    Rule 9(b), as in boy.  The RICO elements must also be

8    pleaded with respect to each individual defendant.

9          In addition, a plaintiff must have been injured by

10   the conduct constituting the violation.  That is, it's not

11   just enough to have an injury.  You must be injured by the

12   conduct that purportedly is the violation.

13         Plaintiffs claim that defendants engaged in a

14   pattern of racketeering activity, specifically mail and wire

15   fraud, designed to defraud Clem and his family in violation

16   of RICO.  They allege that defendants formed an

17   association-in-fact enterprise, conspired for the common

18   purpose of depriving Clem and the Clem and Idona FLP of

19   their equitable share of distributions and used mail and

20   wire communications for fraudulent purposes to further the

21   scheme.

22         I find that the Second Amended Complaint fails to

23   state a RICO claim because plaintiffs have not adequately

24   pled -- pleaded mail or wire fraud, that the alleged

25   association-in-fact enterprise had a structure that was

separate and distinct from the racketeering activity, or that plaintiffs' injuries were proximately caused by the purported racketeering activity.

So looking first at predicate acts, RICO defines racketeering activity as the commission of any of several predicate offenses.  Among those are mail and wire fraud.  When mail or wire fraud are alleged as the basis for a RICO claim, plaintiffs have to plead, number one, a plan or scheme to defraud; two, the intent to defraud; three, a reasonable foreseeability that the mail or wires will be used; and, four, actual use of the mail or wires to further the scheme.

A scheme to defraud must include some degree of planning and the intent to defraud.  Proof of fraud requires proof of deception or dishonesty.  Plaintiffs contend that defendants conspired for the common purpose of depriving Clem and the Clem and Idona FLP of their equitable share of distributions and used D&Y LLC, D&Y FLP, the trust, and Darkenwald Corporation as vehicles for fraudulently funneling money out of D&Y FLP and disproportionality distributing it to themselves.

But the Second Amended Complaint does not allege any fraudulent misrepresentations, material omissions or deceptions directed at the plaintiffs.  Rather, the allegations describe disputes over business control and

1　financial decisions which do not equate to fraudulent

2　conduct under RICO.

3　　　　　Neither providing notice of the written actions

4　via e-mail or mail, nor the delay in providing notice of the

5　written actions, shows deceit or fraudulent conduct.  And

6　simply labeling a transaction, commission, or distribution

7　as fraudulent obviously doesn't make it so.  And as has been

8　said in the Eighth Circuit *Commercial Properties Investment*

9　*Incorporated* case at 61 F.3d 639, conclusory allegations

10　that a defendant's conduct was fraudulent and deceptive are

11　not sufficient to satisfy the rule.

12　　　　　Furthermore, the use of e-mail or financial

13　transactions and business operations does not transform a

14　governance dispute into mail or wire fraud.  The mailing,

15　for example, must be used for the purpose of executing the

16　scheme.  So it's mail fraud, not mail plus fraud.  It's

17　separate things that incur liability.

18　　　　　Stating that defendants engaged in intentional

19　acts, such as, executing corporate documents, is not

20　particularized -- are not particularized factual allegations

21　suggesting that defendants had an affirmative intent to

22　defraud.  A scheme to defraud need not be fraudulent on its

23　face but must involve some sort of fraudulent

24　misrepresentations or omissions reasonably calculated to

25　deceive persons of ordinary prudence and comprehension.

1      Plaintiffs fail to allege any fraudulent statement or

2      omission designed to deceive sufficient to plausibly state a

3      scheme to defraud.

4             Because the allegations do not establish

5      fraudulent intent or deceptive conduct, plaintiffs have not

6      sufficiently pled mail or wire fraud.

7             Next, a pattern of racketeering.  A pattern of

8      racketeering requires at least two related predicate acts

9      that pose a continued threat of criminal conduct.  Even if

10     the scheme to defraud were assumed, at most the Second

11     Amended Complaint describes a single scheme within a single

12     business dispute.  While plaintiffs attempt to deconstruct

13     the dispute into myriad separate acts to establish a

14     pattern, all of the conduct here is part of a singular

15     family dispute over management and governance of the family

16     business interest.  And I'm focused here on the fact that

17     there's a single cake and not really how many slices there

18     were kind of from the cake.

19            Courts routinely dismiss RICO claims that involve

20     only one scheme, one set of victims, and one alleged purpose

21     because they do not establish the continuity required for a

22     pattern of racketeering activity.

23            Even accepting the allegations as true, the Second

24     Amended Complaint describes a discrete family dispute over

25     control of assets rather than an ongoing criminal enterprise

1     that poses a continued threat.

2            Next, enterprise.  The RICO statute prohibits an

3     enterprise from engaging in the predicate acts of

4     racketeering.  An association-in-fact enterprise must have

5     three structural features; number one, a purpose; two,

6     relationships among those associated with the enterprise,

7     and; three, longevity sufficient to permit these

8     associations to pursue the enterprise's purpose.

9            There also must be allegations that support the

10    existence of an enterprise with an ascertainable structure

11    that is distinct from the conduct of a pattern of

12    racketeering.  Put another way, the association-in-fact

13    enterprise must function as a continuing unit beyond the

14    pattern of the racketeering activity.

15           The Second Amended Complaint has no allegation --

16    no allegations that indicate that all defendants act as a

17    continuing unit with a shared purpose beyond the scheme

18    alleged.  In the Second Amended Complaint, plaintiffs

19    identify 12 defendants but do not allege continuing

20    relationships among them all that could satisfy the RICO

21    enterprise element.

22           So it's not enough that each defendant would

23    continue to exist.  The question is whether the

24    association-in-fact enterprise would still exist, and here

25    no facts are alleged showing that it would.  Nor have

1  plaintiffs alleged how each defendant engaged in the conduct

2  of the enterprise.

3        To establish the conduct element of the RICO

4  claim, plaintiffs have to show conduct by the defendants in

5  association with the enterprise.  To plead this element,

6  plaintiffs must indicate that defendants participated in the

7  operation or management of the enterprise itself.

8        To participate in the conduct of an enterprise's

9  affairs, one must have some part in directing those affairs.

10 Having control over the enterprise is not necessary, but a

11 RICO defendant does have to have some part in the direction

12 of its affairs.  The Second Amended Complaint does not

13 allege that each defendant have some part in the direction

14 of the enterprise's affairs.

15       That is especially true as to Defendants George

16 Yankoupe and Deborah Yankoupe and the George and Deborah

17 Yankoupe FLP entity.  The only allegations that speak to

18 their involvement at all is that they received trust

19 distributions.  They are not alleged to have committed any

20 fraud, and no allegations indicate that the Yankoupe

21 defendants controlled or directed the operations of D&Y LLC,

22 D&Y FLP, Darkenwald Corporations, or the trust affairs.

23       Similarly, no allegations indicate actions

24 relating to the enterprise taken by Defendants the Estate of

25 John F. Darkenwald or the John F. Darkenwald Revocable Trust

UAD June 26, 1986.  No allegations suggest that these defendants knew that the written actions or distributions were unauthorized, let alone fraudulent.

Because plaintiffs' RICO claims are based on predicate acts of fraud, they must allege each defendant's participation in the enterprise under Rule 9(b) -- under the Rule 9(b) heightened pleading standard.  Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiff to differentiate those allegations and inform each defendant separately of the allegations surrounding that defendant's alleged participation in the fraud.

Although some actions alleged are attributed to John, Gil, or Casey, many allegations group all defendants together.  These allegations fail to provide notice to the defendants of their individual roles in perpetuating any predicate acts of fraud and fail to allege how each individual defendant participated in a RICO enterprise.

Next, proximate cause.  A civil RICO plaintiff must show injury by reason of a RICO violation; that is, injury both factually and proximately caused by the violation.  Here, plaintiffs' alleged injuries, which include exclusion from governance, lost assets or funds from mismanagement, and loss from improper distributions, all stem from corporate control disputes and corporate actions,

1    not from mail or wire fraud.  When the alleged harm is

2    derivative of corporate disputes with no underlying

3    predicate act, there is no RICO claim.

4          So in sum, plaintiffs have not alleged facts to

5    support an inference that the changes of governance through

6    written actions or the distributions of various funds and

7    assets was part of a fraudulent scheme.  RICO does not cover

8    all instances of wrongdoing.  Attempts at converting

9    ordinary civil disputes into RICO cases are routinely

10    rejected in the Eighth Circuit.

11          Whether any of the defendants' actions breached

12    the parties' agreements or breached a fiduciary duty owed to

13    plaintiffs is left to be determined.  But even if there were

14    such a breach, such actions would be insufficient to

15    establish RICO liability.  And here, while the Darkenwald

16    brothers may have been playing hardball, and I take no

17    position on that, fraudulent intent has not been -- the

18    pleading of fraudulent intent has not been sufficiently

19    supported.  And for that reason, the RICO claim is

20    dismissed.

21          The remaining claims are based on state law and,

22    at my discretion, I would decline to exercise supplemental

23    jurisdiction over the remaining state law claims if RICO is

24    the only claim that has this matter land in Federal Court.

25          So it is my preliminary to see, subject to hearing

1    from you all, that Defendants D&Y Partners, LLC, and the D&Y

2    Family Limited Partnership's motion to dismiss the Second

3    Amended Complaint will be granted; Defendants George

4    Yankoupe, Deborah Yankoupe, and the George and Deborah

5    Yankoupe FLP's motion to dismiss is granted; J&T defendants'

6    motion to dismiss will be granted; and the Casey defendants'

7    motion to dismiss will be granted.

8           So that's a lengthy preliminary for kind of how I

9    viewed the case and the facts related to the Second Amended

10   Complaint.  So I'm going to turn to Mr. Fornwald and I'll

11   hear you out.

12           MR. FORNWALD:  Thank you, Your Honor.  Good

13   afternoon.

14           THE COURT:  Good afternoon.

15           MR. FORNWALD:  And while I don't love where your

16   preliminary order has ended up, I do really sincerely

17   appreciate the fact that you've led with that, and I am glad

18   to have the opportunity to try to convince you when you walk

19   out of here today that you should change your mind on that.

20           Your Honor, I think what makes most sense is to

21   try to go through the elements of the RICO claim broadly and

22   talk about the specific allegations in the Second Amended

23   Complaint that tie to each of those elements and

24   satisfactorily plead them.

25           Your Honor stated the four elements of a RICO

claim as we understand them:  The conduct of an enterprise

through a pattern of racketeering activity.  And in essence,

I think those can be bunched together a little bit and look

at them as sort of two combined.  The conduct of an

enterprise, through a pattern of racketeering activity.

Here, Your Honor, "enterprise" is broadly defined

under statute as any legal entity and any group of

individuals associated in fact although not a legal entity.

And I would point the Court to the *Atlas Pile

Driving* case, which is an Eighth Circuit case.  And it says,

"Separating the enterprise from the pattern of racketeering

is generally not problematic where a legal entity is

involved."

Here, Your Honor, to be absolutely clear, the

enterprise at issue is the D&Y entities, collectively D&Y

FLP and D&Y LLC as the managing partner and the limited

partnership.  Those are legal entities that have existed for

decades and are clearly pled in the Second Amended Complaint

as having been legitimate legal entities that did legitimate

business for decades prior to the actions that began in 2021

when they became the subject of and the vehicle for the

racketeering activity in this case.

Now, Your Honor, we actually plead enterprise in

two ways.  Number one, enterprise as those legal entities,

which is, according to *Atlas* and a number of cases in front

1 of Your Honor, a almost insurmountable definition of

2 enterprise for RICO when you have a legitimate business that

3 has been overtaken and used for improper purposes by a

4 group.

5    But we also allege an enterprise in fact, an

6 association-in-fact. And as Your Honor correctly pointed

7 out, association-in-fact requires three elements: A

8 purpose, relationships among those associated with the

9 enterprise, and longevity sufficient to permit those

10 associates to pursue the enterprise's purpose.

11    So if you look at the complaint, Your Honor,

12 longevity is absolutely pled.

13    THE COURT: Well, is it? I mean, what I'm really

14 trying to understand here is the enterprise has to have an

15 ascertainable structure that is distinct from the predicate

16 acts, and it's not enough that each defendant would continue

17 to exist. This is the equivalent of Cosa Nostra. And I'm

18 trying to understand what is that enterprise and what was

19 pled that says that that enterprise that is separate from

20 simply the distinct corporate members would continue to

21 exist?

22    MR. FORNWALD: The enterprise in its simplest form

23 are the D&Y entities, Your Honor, that have existed, have

24 legitimately owned business, have legitimately done business

25 for decades.

1          And at the end of this, if the racketeering

2     activity were ended, the D&Y entities would continue to

3     exist and they'd continue to be legitimate enterprises.

4          Beyond that, as far as the association-in-fact,

5     what you have is a group of family members and businesses

6     that they -- and family partnerships that they individually

7     own that have been associated in a number of different

8     overlapping business dealings.  You've got them as co-owners

9     and operators of the D&Y entities, which we already just

10    talked about, but you've got multiple defendants who own,

11    for instance, Darkenwald Corporation that has been used as a

12    vehicle to receive funds out of the D&Y entities.  You've

13    got individuals who own and operate family limited

14    partnerships that have been used to secret funds and funnel

15    funds out of the D&Y entities.  All of those entities and

16    their interrelationships would continue to exist even

17    without the racketeering activity involved here.

18          THE COURT:  I hear your argument.

19          MR. FORNWALD:  Okay.  Your Honor also focused a

20    number of your comments on sort of the second half of the

21    RICO claim, which is through a pattern of racketeering.  And

22    here you're absolutely right, the racketeering that we're

23    alleging is mail and wire fraud.  Where our analysis differs

24    from what Your Honor read in your preliminary findings

25    involves the overlay that defendants argued regarding

1    essentially common law fraud elements as a necessity to

2    plead a RICO claim.  That absolutely is not the case.

3         If there's one case that I would ask Your Honor to

4    focus on as far as analysis of this case through the lens of

5    an existing Eighth Circuit case, it is the *Abels* case, which

6    is 259 F.3d 910.  The *Abels* case was in exactly the same

7    posture as this case.  It was a motion to dismiss that was

8    granted by the District Court, went up on appeal to the

9    Eighth Circuit, and the Eighth Circuit said, pleading has

10   been adequate for a RICO claim.

11        And in doing so, the *Abels* case differentiated

12   essentially common law fraud and the need for direct

13   misrepresentations from what is actually required to plead

14   an adequate RICO claim.  And at page 918 of that case, it

15   says, "Mail fraud is broad in scope and its fraudulent

16   aspect is measured by a nontechnical standard condemning

17   conduct which fails to conform to standards of moral

18   uprightness, fundamental honesty, and fair play."

19        That is exactly what we have here.  And when you

20   go through the four elements of mail and wire fraud, a plan

21   to scheme and defraud, intent to defraud, reasonable

22   foreseeability that the mails will be used in order to carry

23   out that fraud, and actual use of the mail and wires to

24   further the scheme, all of those elements are pled in the

25   Second Amended Complaint.

1    For instance, from paragraphs 42 to 66, there are

2    detailed allegations regarding a multi-year scheme, the

3    longevity of a RICO scheme, that talks about essentially for

4    two or three years defendants collectively, working together

5    to wrest control of the D&Y entities from Clem Darkenwald

6    and his family; to pass secret written actions; to conceal

7    those actions from him for an extended period of time; to

8    create new governance documents; and to ultimately find a

9    way to take a member and board-managed LLC, which is the

10   managing partner of the FLP, to take that from an

11   organization that was run collectively and to put it in the

12   hands of one family.

13   Then, once that first step of the plan and the

14   scheme were completed, then from 2023 to 2024, using

15   relationships with the trust, with Darkenwald Corporation,

16   to funnel money and assets out of those D&Y entities and

17   into the pockets of the complicit.  Those are alleged in

18   paragraph 69 through 85.

19   For instance, that scheme to funnel money,

20   Your Honor, involved Casey, Tonya Darkenwald, and Darkenwald

21   Corporation and D&Y FLLLP as the managing member, in effect,

22   entering into a phony asset management agreement that

23   funneled $15,000 a month out of a passive real estate

24   company and into the pocket of one family.  All four of

25   those defendants were directly involved in and signatories

1    to that agreement.

2         You then have, in paragraph 76 through 84, a

3    description of how Casey, Tanya, the John and Tanya Family

4    Limited Partnership, George Yankoupe, Deb Yankoupe, and the

5    Yankoupe FLP, all conspired to and participated in a scheme

6    to funnel money out of D&Y FLP where it would have to be, as

7    a matter of law, distributed pro rata to its limited

8    partners, funnel that money out through a family trust in

9    order to exercise Casey Darkenwald's discretion to pick and

10   choose to whom people send that money.

11        It is a plan and a scheme that was put in place

12   and carried out for years in order to get money in the

13   pockets of a few, and everyone was complicit in it to a

14   varying degree.

15        THE COURT:  Well, I understand how Clem wouldn't

16   like it, but could you say more about how it is pled that

17   that's fraudulent to do?

18        MR. FORNWALD:  So, Your Honor, the -- the issue

19   there is we can't think about fraud through a common law

20   fraud lens, which is misrepresentation, reliance, loss.  And

21   the *Abels* case says that directly.  We're not talking about

22   common law fraud.

23        THE COURT:  Well, what does it mean?  You tell me

24   what it's not, but what is it then?

25        MR. FORNWALD:  Yeah, absolutely.  It is a scheme

1  or plan that is intended to deceive and allow, through

2  deceit, certain people to use an enterprise to benefit.

3  THE COURT:  This is like the lump in the carpet.

4  Then I wonder how is deceit defined?  Once we now step on

5  that, now we've got to define deceit, and is it simply

6  enough for somebody to say -- or at least to plead, I think

7  I should have known about that but they didn't tell me;

8  therefore, that satisfies deceit from a pleading point of

9  view?

10  MR. FORNWALD:  Well, let's talk about what the

11  allegations are in this claim -- or, Your Honor, as far as

12  what that plan and scheme was and how Clem and his family

13  was deceived.  And, frankly, you know, let's focus on even

14  through a lens of if this were common law fraud.  Okay?

15  Here are things that are alleged as far as direct

16  misrepresentations directly in the complaint.  Now,

17  remember, Your Honor, I apologize for the length of our

18  first pleading.  I know it was long.  Some of that had to

19  come out as a result of Your Honor's order that we pare down

20  to comply with Rule 8.  And in that November conference, you

21  acknowledged --

22  THE COURT:  Wait a minute.  I didn't suggest that

23  be pared down to the extent that you weren't able to state a

24  claim.  So you're not suggesting that, are you,

25  Mr. Fornwald?

1          MR. FORNWALD:  No, no.  I'm suggesting,

2     Your Honor, that there were specific factual allegations in

3     the initial pleading that had to come out in the Second

4     Amended Complaint in order to fit within Your Honor's

5     30-page directive.

6          So some of these things -- all of these things are

7     still in the Second Amended Complaint.  They're just not in

8     the Second Amended Complaint enumerated and quoted like they

9     were in the first.  But documents are incorporated, and

10    Your Honor can take reference of those.

11         So here are the direct misrepresentations, even if

12    that were the standard that exists here.

13         THE COURT:  Yeah, no, I'm trying to understand

14    where is the pleading that establishes the proof of

15    deception and dishonesty, not simply that somebody claims I

16    didn't know about this and I feel I should have known,

17    but...

18         MR. FORNWALD:  Absolutely, Your Honor.  Let's

19    start with the May 2021 written action.  It's a written

20    action that for the first time in the history of the company

21    is undertaken by two of the members, excluding Clem

22    Darkenwald as a member and who at the time was the chief

23    manager of that company.

24         A written action is undertaken in order to

25    terminate a number of agreements, essentially start

1    positioning the company in a place that only two people,

2    John and Gil, are in control of the company.  And then

3    you've got the series of written actions.  That written

4    action, the September written action, the December written

5    action ultimately that results in an amended operating

6    agreement that Clem knows nothing about, that is deceit.

7         And it's particularly deceit, Your Honor, because

8    the signatories to those written actions knew, they'd been

9    expressly told by counsel years earlier that they could not

10   amend the transfer provisions of the operating agreement

11   without the consent of all members.  It was absolutely

12   fraudulent.  It was knowingly fraudulent.  And we allege

13   that directly, I believe it's in paragraph 62 of the Second

14   Amended Complaint.

15        John Darkenwald and Gil Darkenwald knew that they

16   could not undertake the corporate manipulation that they

17   were doing, but they did it anyways.  They concealed those

18   facts from Clem, and that, Your Honor, is deceit.  And we

19   allege that there were communications among everyone behind

20   the scenes regarding that -- those actions and that intent.

21   And for that reason, everybody had a role in the RICO

22   enterprise.

23        I want to focus on that for a second, Your Honor.

24   In your preliminary ruling, you referenced how each -- there

25   have to be allegations that each defendant participated in

the conduct of the enterprise, not the management of it but somehow participated in it. Your Honor, this is again where *Abels* is directly on point with what is happening here. In *Abels* -- and I apologize for the length of the quote that I'm going to read, but they say -- that case says specifically that particularly in a RICO case like this, many of the communications making up the predicate acts of RICO are exclusively in the hands of the defendants. And for that reason, the *Abels* Court ruled -- they held -- I mean, it's a legal holding binding here -- I take that back. They -- the legal holding binding is that you don't have to plead fraud with particularity.

But *Abels* says, "The plaintiffs are surely correct that a court cannot reasonably expect highly specific allegations before allowing at least a brief discovery period. The facts would have to be alleged are known to the defendants but the plaintiffs have not yet had a chance to find them out."

It goes on.

"Where a plaintiff is not a party to a communication, particularly in pleading may become impracticable. Here, although the plaintiffs have been allowed to amend their complaint," like we were, "they have not had the benefit of discovery. We think it only fair to give them that benefit before requiring them to plead facts

1     that remain within defendant's private knowledge."

2          Now, Your Honor, when we had our initial

3     conference in November, it was almost as though you had

4     *Abels* in mind when you talked to the parties.  You said

5     expressly then, and you included in a November 27th order at

6     Docket Number 39, that expedited discovery will not be

7     stayed during the pendency of any motion to dismiss.

8          Then you may remember, Your Honor, that when

9     defendants moved to dismiss, they again asked for a status

10    conference to try to convince Your Honor that discovery

11    should be stayed once again, and you issued a second order,

12    a text order, on January 6th, 2025, that said, "The order at

13    Doc 39 remains in effect, including paragraph 7 which

14    states, 'Expedited discovery will not be stayed during the

15    pendency of a motion to dismiss.'"

16         Notwithstanding twice clearly ordering that

17    discovery needed to move forward, Your Honor, defendants

18    have absolutely stonewalled plaintiffs with respect to

19    document production.  And there's a motion to compel pending

20    before Magistrate Judge Elkins right now that has been

21    undecided.

22         Defendants have flatly refused to search for

23    e-mail correspondence between them except for in the e-mail

24    account of one individual defendant, Casey Darkenwald.  This

25    is exactly what *Abels* was talking about.  Here what we

1     allege in paragraphs 154 and --

2          THE COURT:  Before you go on, then what discovery

3     have you gotten, because you've said they've stonewalled

4     you.

5          MR. FORNWALD:  We've gotten fewer than 600

6     documents, 303 of which are a reproduction of information

7     that Clem turned over when he ceased being the manager of

8     the company.  They have nothing to do with this case.  So

9     there's about 280 or so arguably relevant documents that

10     include less than 40 relevant e-mails.

11          And within those e-mails, Your Honor -- and I'm

12     glad you asked this -- within those e-mails, fewer than 40

13     total over the course of a four-year period, one of the

14     e-mails that we see is an e-mail from Casey Darkenwald, who

15     is exercising control over the D&Y entities, to George

16     Yankoupe, who Your Honor said there doesn't appear to be any

17     connection between Mr. Yankoupe and the management of the

18     company.

19          In September 2021, Casey writes to George, sends

20     him a copy of the September 2021 written action that is a

21     fundamental element of our claim, and he says, "Any thoughts

22     on these?" meaning the written actions before they go out.

23     He's seeking George Yankoupe's input on what's going to

24     go -- George Yankoupe is not a member or governor of the

25     LLC.  He's a limited partner in the FLP.  And here he's

1    being asked by the manager of the LLC, any input on this

2    written action before we put it in place and tell Clem what

3    we've done to the company. Doesn't seek Clem's input. This

4    is the pattern of deceit. Everyone was aware this was

5    happening from its initial steps in September of 2021.

6          If we were permitted the discovery that Your Honor

7    has now twice said that we are entitled to get, who knows

8    how many more of these predicate acts would underlie our

9    claims. And that is precisely what this RICO case is built

10    on. The predicate acts aren't just the communications

11    regarding the manipulation of D&Y to -- those communications

12    to Clem. We know about those communications.

13          The predicate acts aren't just the fraudulent

14    transfers of money to a select few. We know about those

15    transfers. The predicate acts are everything that happened

16    behind that. It's the communication among all of the

17    individuals spanning for years about how they're going to

18    essentially freeze Clem out, transfer money however they

19    can, and deprive his family of their fair share. That is

20    the fraud, that is the mail fraud, that is the wire fraud.

21    And all of those things are legitimate mail and wire fraud

22    predicate acts that do not require direct misrepresentations

23    by anyone to Clem.

24          Now, Your Honor also focused on damages, and I

25    want to be clear about that. There is proximate cause of

1   direct harm as a result of all of these things, and here it

2   is. Following the manipulation of the corporate governance

3   that we know was being communicated about between everyone

4   in some capacity, at least some e-mails we have seen, as a

5   result of that corporate manipulation, then Stage 2 of the

6   scheme begins, and it's the transfer of money to everyone

7   but Clem.

8           In doing that, more than a million 5 --

9   $1.5 million is funneled from the D&Y entities through the

10  trusts and distributed out to two families. Clem, as a

11  limited partner with a nearly one-quarter interest in that

12  company, has an absolute legal right to pro rata

13  distributions. He's directly harmed. That's not a

14  derivative action. That is a direct action. Clem is

15  directly harmed when money gets distributed out

16  disproportionately to other members.

17          Same thing with the cabin. First, the cabin is a

18  tangible asset of the company. It is an asset that doesn't

19  get distributed with a check. It gets distributed through

20  pro rata usage, in kind distribution. Under the statute,

21  Clem is absolutely entitled to that in kind distribution of

22  an equal share of the cabin, to use the cabin. He's been

23  deprived of that for four years. That's a direct harm.

24          Likewise, for years Clem contributed to the

25  maintenance and upkeep of the cabin. And when John and Gil

1    were conspiring to take over and remove Clem in the written

2    actions, one of the things that they say is, We're going to

3    do an audit and an accounting and everyone is going to get

4    reimbursed.  Clem doesn't get reimbursed.

5         THE COURT:  You probably don't need to argue that

6    any further.  I mean, the whole issue of the harm is if I

7    did not preliminarily, as a threshold, find that there was

8    fraudulent mail or wire fraud, then I would not have found

9    then the harm to be associated with that.  So I hear your

10   arguments, but the problem for me was upstream of that.

11        MR. FORNWALD:  Okay.

12        THE COURT:  Why don't you take a few more minutes

13   and I'm going to hear from the defense and I'm going to give

14   you a chance to respond.

15        MR. FORNWALD:  Thank you, Your Honor.  In light of

16   that comment, I just want to focus my final thoughts on the

17   existence of the mail and the wire fraud.  And I want to

18   stress the fact that *Abels* makes clear in the Eighth Circuit

19   that direct misrepresentation and reliance as a common law

20   fraud factor is not required to establish mail and wire

21   fraud.  It is essentially when the mails and wires are used

22   to facilitate a scheme of deceit.  That is exactly what

23   happened here.

24        For two years, there was behind the scenes

25   manipulation that was concealed from Clem, followed by two

1    years of pilfering assets from a company in which Clem had

2    an equal right.  That, Your Honor, and the use of the D&Y

3    enterprise to facilitate the funneling of funds to the

4    various individual defendants, is an actionable RICO claim;

5    and for that reason, Your Honor, I would simply ask you to

6    reconsider your preliminary ruling.

7            THE COURT:  Thank you, Mr. Fornwald.

8            So I don't know that I need to hear from all of

9    the defendants, but would somebody like to come up first and

10   respond to Mr. Fornwald.

11           MR. ASMUS:  Your Honor, thank you.  Your Honor,

12   again, Jason Asmus on behalf of the D&Y entity defendants.

13   I'm going to address three quick things, Your Honor.

14           One, enterprise.  If the D&Y entities are the

15   enterprise, then the first distinctiveness requirement fails

16   and they cannot be defendants.  They can't be a defendant

17   and the enterprise at the same time.  The *Atlas* case talks

18   about both distinctiveness requirements.  I would point the

19   Court to that decision for that issue.  I'm sure the other

20   defendants have more enterprise arguments that they can --

21   can and will make and have made in the briefing as it

22   relates to the assertion that it's the D&Y entities that are

23   the enterprise.

24           With respect to the association-in-fact

25   enterprise, we agree with you.  Our argument was your

1    preliminary finding, that there is no distinctiveness for

2    the association-in-fact enterprise that's separate from the

3    alleged racketeering activity.  So that's all I'll say on

4    that.

5           With respect to the predicate acts, the *Abels* case

6    cited by Mr. Fornwald, 2001 decision from the Eighth

7    Circuit, as the Court noted, the *H&Q Properties* case, 2015

8    case from the Eighth Circuit, identifies the requirements

9    when mail and wire fraud are the alleged predicate acts,

10   there needs to be a scheme or plan to defraud and there

11   needs to be intent to defraud.  The first two of the four.

12          What *Abels* decided was that there didn't need to

13   be a fraudulent statement or misrepresentation in the mail

14   or wire communication itself.  And what the Court found in

15   that case was that there were other allegations within the

16   operative pleading in that case that demonstrated the

17   existence of the fraud.  But what the Court said in the

18   holding -- and, Your Honor, I'm looking at page 920 of the

19   decision in *Abels* -- a plaintiff must specifically allege

20   the, quote, circumstances constituting the fraud, including

21   such matters as the time, the place, and the contents of the

22   false representations, as well as the identity of the

23   persons that made the false representations.

24          That's what we argued to you in our reply brief

25   and we addressed *Abels* and how it fit; Docket 92, pages 5

1  through 6.  There aren't any allegations in the complaint

2  about false statements, fraudulent statements or omissions

3  sufficient to support the use of the mail or wires in the

4  commission of those frauds.

5          Last point, Your Honor, as to expedited discovery.

6  Your Honor allowed expedited discovery.  It related to a

7  preliminary injunction motion that was intended following

8  the TRO motion.  Notably, the TRO motion didn't address the

9  RICO claim at all.  And so what Your Honor was focusing on

10  with the expedited discovery was not discovery to determine

11  after a Second Amended Complaint is filed whether they can

12  find facts to finally plausibly plead a RICO claim.  It was

13  to keep a potential PI motion on the same track while the

14  motion to dismiss was pending.

15          Last comment, Your Honor, the D&Y entities

16  produced five full years' worth of financial documents,

17  general ledgers, bank statements, et cetera, et cetera, and

18  so a reference -- each collection of those for a five-year

19  period is a single document.  So to focus on a number of

20  documents in terms of the discovery is a bit misleading.

21  All the financial information has been provided for the last

22  five years from the D&Y companies as part of the discovery.

23  Although I'll note to close, discovery is not relevant to

24  whether the Second Amended Complaint plausibly pleads a RICO

25  claim.

1          Your Honor, thank you.

2          THE COURT:  Why don't you speak to the arguments

3     that Mr. Fornwald had about the sufficiency of the fraud

4     pleading.

5          MR. ASMUS:  So the argument that is made, relying

6     on the *Abels* case, is responsive to an argument that we

7     raised in our opening brief which is, hey, the Second

8     Amended Complaint does not identify any false statement in

9     the mail communication or the wire communication.  Cite

10    *Abels* where the Court does say, yeah, there doesn't need to

11    be a false statement in the subject mail or wire

12    communication.  But later in the decision, the Court does

13    say, yes, there needs to be false misrepresentations as part

14    of the case, and those need to be pled with particularity.

15    And our argument, as we articulated better, frankly, in our

16    reply brief, was there's nothing in the Second Amended

17    Complaint, whether it's the communications that are the wire

18    or mail communications themselves, or as to anything else

19    where there was a false misrepresentation, a deceitful

20    representation or omission that was made.

21          And that's the nature of our argument, Your Honor,

22    as to why predicate acts are not plausibly pled.

23          THE COURT:  And Mr. Fornwald was arguing that

24    there was great evidence of deceit that spanned four years;

25    that they were sneaking around behind Clem's back plotting

1    to execute in ways that they knew were improper.

2             MR. ASMUS:  And respectfully, Your Honor, I don't

3    think that's what the Second Amended Complaint pleads.  The

4    Second Amended Complaint pleads that there were these

5    written actions taken, and that upon the written actions

6    being taken, the plaintiffs were notified of those written

7    actions.

8             There's an allegation in paragraph 62 of the

9    Second Amended Complaint regarding a 2012 advice that was

10   given by a former lawyer in terms of whether unanimous

11   consent was required.  That, Your Honor, was actually an

12   attachment to one of the initial complaints.  It's not an

13   attorney's advice to all three of the owners of the D&Y

14   entities.  It's an e-mail to Clem that Clem forwards to the

15   other members saying, Hey, here's what one attorney told us

16   as to what we should do if we need to amend these corporate

17   documents.  It certainly isn't binding.  It's not our

18   position, Your Honor, as counsel for the D&Y entities.  It's

19   not an accurate statement.

20            THE COURT:  All right.  Thank you.

21            MR. ASMUS:  Thank you, Your Honor.

22            THE COURT:  Any of the other defendants?

23            MR. BROWN:  Your Honor, may I for just a moment?

24            THE COURT:  Yes, please.

25            THE COURT REPORTER:  Is your microphone still on?

1          THE COURT:  No.

2          MR. BROWN:  Good afternoon, Your Honor.  Dan Brown

3    on behalf of the Yankoupe defendants.

4          THE COURT:  Good afternoon.

5          MR. BROWN:  I'd like to pick up, actually, right

6    where the question was left off about that scheme to

7    defraud.  I would like to draw the Court's attention -- I

8    know we've talked about the *Abels* case -- the most recent

9    case in the Eighth Circuit on RICO pleadings is actually the

10   *UMB Bank* case that we cited.  It's 89 F.4th 1047.  And the

11   sentence in that case is that mail and wire communications

12   are insufficient to establish RICO continuity factor unless

13   they contain misrepresentations themselves.  That's the most

14   recent statement from the Eighth Circuit.

15          Even if you didn't look for the misrepresentation

16   in the actual e-mail or wire fraud allegations, you'd still

17   be looking for that scheme to defraud.  And the *Abels* case

18   is actually a really good case for understanding what's

19   missing in this complaint, because the *Abels* case is about

20   these hedge-to-arrive contracts.  We won't worry about what

21   they mean exactly, but they are a device where the

22   defendants in that case were telling a bunch of farmers they

23   could avoid all pricing risk if they just entered into these

24   hedge-to-arrive contracts.  That's the first description of

25   the facts in the *Abels* case.  That means that the scheme to

1  defraud still needs to contain some sort of

2  misrepresentation, some sort of fraudulent conduct.

3          As it relates to the Yankoupe defendants,

4  Your Honor, respectfully, I believe Your Honor has it

5  correct that they did not, in fact, do anything allegedly

6  wrong.  The only allegation in the complaint tying them is

7  that they received some money from the trust.

8          I will point out that in the case law, *Aguilar* is

9  a great example of this, Your Honor.  That's at 853 F.3d at

10  402.  *Aguilar* is a really on point case about the fact that

11  even if we stretch past just the misrepresentation issues,

12  even if we stretch past the idea that a defendant should

13  have had to have conduct which actually participates in,

14  even then the standard would be that there would at least

15  have to be a manifest agreement to participate in criminal

16  activity.  And what's missing in this complaint as to the

17  Yankoupe defendants is any allegation -- notwithstanding

18  reading emails at Your Honor in the courtroom today, there

19  is no allegation in the complaint claiming that there was a

20  manifest agreement by George or Deborah Yankoupe to

21  participate in criminal activity, and we do agree that the

22  complaint should be dismissed.

23          THE COURT:  Mr. Fornwald says that for them to

24  have engaged together in an act of deceit is sufficient from

25  a pleading point of view.

1          MR. BROWN:  The deceit is not -- respectfully,

2     Your Honor, deceit is not the standard actually.  The

3     standard is not sort of this moral turpitude that's been

4     described in *Abels*.  The actual standard is that there needs

5     to be a scheme to defraud, and that scheme to defraud would

6     need to involve George or Deborah Yankoupe having alleged in

7     the complaint to have actually participated in some function

8     that they understood and agreed that there was a criminal

9     activity going on.

10          THE COURT:  And it's an objective standard.

11          MR. BROWN:  It is, yes.  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          MR. MERGENS:  Your Honor, if I may very briefly?

14          THE COURT:  Yes, you may.

15          MR. MERGENS:  Mike Mergens, Your Honor, on behalf

16     of the Casey defendants.  I just want to bring to the

17     Court's attention one -- two rather important issues.  And

18     there's been a lot of talk about the written actions and

19     they're deceitful because Clem wasn't consulted before they

20     were passed.

21          Minnesota Statute 322C.0407(4), "An action

22     required or permitted to be taken at a board meeting may be

23     taken by written action signed by the number of governors

24     that would be required to take the same action at a meeting

25     of the board of governors at which all governors were

1   present."

2        As alleged in the complaint, there were three

3   governors.  John and Gil R. Make up two governors.  That's

4   the majority of the board of governors.  Under Minnesota

5   statutes, they are allowed to pass written action without

6   taking a meeting.  That statute became effective to all LLCs

7   in 2018.

8        The other thing I want to point out in the

9   complaint, paragraph 77, they admit that D&Y owed the trusts

10   under two promissory notes.  Later on they call them alleged

11   promissory notes, but they admit that they exist.  They

12   admit it was a valid debt of the entity.  It was a business

13   decision of a majority owner of D&Y to pay the debts that it

14   owed to the trust.  Once it leaves the trust, that's the end

15   that it relates to this case.  Thank you.

16        THE COURT:  All right.  Thank you.

17        MR. PFUTZENREUTER:  Your Honor, if I may very

18   briefly?

19        I think the plaintiffs' allegations that this was

20   all done in secret are contradicted by their admission that

21   John Darkenwald and Gil Darkenwald ultimately, quote,

22   disclosed the fraudulent scheme to them in March of 2022.

23   At that point, whatever sort of injury that might result

24   from that, the causal chain, has to be broken because Clem

25   Darkenwald knows the scheme.

1       It's correct that statutory fraud might involve an

2   omission, but that begs the question then what -- what would

3   Clem -- or Clem Darkenwald have done differently had he had

4   the material information.  And the answer is nothing because

5   that is, indeed, what he did once allegedly the scheme was

6   disclosed to him.

7       Finally, Your Honor, I agree with my

8   co-defendants' counsel about the *Abels* case.  The *Abels*

9   case, in fact, involved representations and plaintiffs who

10  were induced into acting upon them.  So it doesn't stand for

11  the proposition that fraud can be pled without deceit or

12  that Rule 12's requirements don't need to be met or that

13  discovery is necessary in order to plead fraud.

14      Thank you, Your Honor.

15      THE COURT:  Thank you.

16      Mr. Fornwald.

17      MR. FORNWALD:  I'll be brief, Your Honor.

18      Your Honor, *Abels* still is good law in the Eighth

19  Circuit, and *Abels* sets out a standard that is very

20  different than the common law fraud standard, particularly

21  Mr. Pfutzenreuter just iterated about a misrepresentation,

22  reliance and harm.

23      It -- mail fraud is broad.  Mr. Brown acknowledged

24  it's -- I believe -- well, maybe you didn't.  It is a

25  subjective test.  I don't know what you actually said, I

1    apologize.

2           MR. BROWN:  I don't believe that actually was a

3    question.  I'm sorry.

4           MR. FORNWALD:  It's a subjective test.  It is

5    measured by a nontechnical standard condemning conduct which

6    fails to conform with standards of moral uprightness,

7    fundamental honesty, and fair play.  That is precisely what

8    we have pled in the Second Amended Complaint through a

9    four-year plan and scheme to act in a manner that lacked

10   moral uprightness, fundamental honesty, and fair play.

11          Indeed, even in the D&Y --

12          THE COURT:  So I just want to make sure I've got

13   this straight in my head, and if I don't, I'm going to get

14   it straight.  A scheme to defraud need not be fraudulent on

15   its face but must involve some sort of fraudulent

16   misrepresentations or omissions reasonably calculated to

17   deceive persons of ordinary prudence and comprehension.  Is

18   that wrong?  Because that's an objective standard.

19          MR. FORNWALD:  It does not require -- an objective

20   standard of falsehood in concealment?  Was that the words

21   that you read, Your Honor?

22          THE COURT:  A scheme to defraud need not be

23   fraudulent on its face but must involve some sort of

24   fraudulent misrepresentations or omissions reasonably

25   calculated to deceive persons of ordinary prudence and

1  comprehension.

2  MR. FORNWALD:  We do not disagree with that, and

3  I'll tell you exactly where we have pled it.

4  THE COURT:  Well, but before you tell me that,

5  that's an objective standard.  Persons of ordinary prudence

6  and comprehension; correct?

7  MR. FORNWALD:  I guess --

8  THE COURT:  You guess?

9  MR. FORNWALD:  That does sound objective,

10  Your Honor.  That sounds different than the portion of *Abels*

11  that I was reading.

12  THE COURT:  It does.

13  MR. FORNWALD:  Yeah, but that does sound

14  objective.

15  THE COURT:  No.  Please proceed.

16  MR. FORNWALD:  Certainly.  And to meet that

17  objective standard, Your Honor, here is what the Second

18  Amended Complaint says.  It says that, at paragraph 43, a

19  May 2021 written action was entered into, subsequently

20  disseminated to Clem Darkenwald.  None of this was done in

21  advance as required in the operating -- or immediately upon

22  being done as required in the governance documents.

23  But that May 2021 written action plainly stated

24  that each Darkenwald family would be authorized to use the

25  cabin according to a fair and reasonable schedule.  That did

1    not happen.  From 2021 forward, Clem Darkenwald and his

2    family were deprived use of the cabin.  It's a fundamentally

3    false statement in the written action that was disseminated

4    to him.

5              That same written action also says that the

6    company would reimburse each of the four branches of the

7    Darkenwald family for their share of fees contributed to

8    maintenance of the cabin.  That did not happen.  That is a

9    objectively false statement.

10              The September 2021 written action pled at

11   paragraph 25 says that Darkenwald family members seeking to

12   use and have the benefit of the cabin would be able to

13   continue it.  That did not happen.  It's an objectively

14   false statement.

15              That same written action also said that John

16   Darkenwald would audit and reimburse all contributions made

17   for maintenance of the cabin.  Did not happen.  It's an

18   objectively false statement.

19              That same written action also said that all

20   members will remain involved in operational decisions of the

21   company.  That did not happen.  Clem Darkenwald has not been

22   involved or invited to a single meeting of any of the

23   companies since 2021.  That is alleged in the complaint.

24              There's also myriad fraudulent concealment pled in

25   the Second Amended Complaint, including the fact that from

1          June 2021, companies continued to operate but Clem has been

2     excluded from any discussions regarding that.

3              There's the fact that the operating agreement

4     wasn't disseminated until months after it was entered into,

5     the amended operating agreement.

6              There's the fact that Gil Darkenwald sold his

7     interest to John and Tanya FLLP.  We still don't know the

8     details of that and don't -- all of that has been concealed

9     from Clem.

10              And the fact that on multiple occasions Clem has

11     made statutory requests for information from the companies

12     that have been not fully responded to and information has

13     been concealed and withheld from him.

14              So, Your Honor, at least at a base pleading

15     standpoint --

16              THE COURT:  How do you respond -- Mr. Mergens

17     cited Minnesota Statute 322C.0407(4), which ultimately

18     stands for the proposition that there were the requisite

19     number of governors involved in making the decision; that

20     this particular statute had been in effect -- was in effect

21     in 2018, applicable to all LLCs, so there was nothing

22     unlawful, illegal, criminal about what the governors did

23     when they came together, made a decision, and didn't involve

24     Clem?

25              MR. FORNWALD:  Your Honor, taken in the full

1    context and the fact that one of those written actions also

2    involved an amendment to the operating agreement that

3    required unanimity, that is an absolute violation of the

4    statute.

5          THE COURT:  Right.  Let me pause you just there

6    for a second, Mr. Fornwald.  I want Mr. Mergens to respond

7    to this because I want to just make sure I've got it

8    straight.  I'll let you come back up.

9          MR. FORNWALD:  Certainly, Your Honor.

10          MR. MERGENS:  Thank you.  The statute is plain as

11    day.  I'm not exactly sure how he said it's a violation of

12    the statute.  An action required or permitted to be taken at

13    a board meeting may be taken by a written action signed by

14    the number of governors that would be required to take the

15    same action at a meeting of the board of governors.  The

16    statute expressly states governors can act without a meeting

17    through written action.  I don't know how better to say it

18    than the statute says what it says.

19          THE COURT:  All right.

20          MR. MERGENS:  Thank you, Your Honor.

21          THE COURT:  We'll see if Mr. Fornwald -- we'll see

22    if it says something other than what it says.

23          MR. FORNWALD:  Your Honor, the general premise of

24    unless a governance document says otherwise, that written

25    actions suffice if they have sufficient support is accurate.

1    That is an accurate statement of law.

2         Here, we have governance documents that say

3    certain things also need to occur, and one of those things

4    that needed to occur was unanimous approval of all members

5    in order to authorize any transfer of ownership interest.

6    You cannot amend that away through a less than unanimous

7    written agreement or it's a violation of Minnesota law.

8         The agreement also says -- and I apologize, I do

9    not have it in front of me and I cannot pinpoint it, but I

10   believe we have referenced it in our brief -- that written

11   actions require prompt notice, or immediate notice, I can't

12   remember which word it is, to any member who isn't subject

13   to or a party to the written action.  That absolutely did

14   not occur, and we allege it multiple times, that these

15   written actions were taken and sometimes months later Clem

16   Darkenwald would find out about them.

17        So the fact that there is -- I don't dispute there

18   is a statement in Minnesota law that written actions, if

19   they have ample -- have sufficient support under the

20   governance documents to take the action that they purport to

21   take, can happen.  But this, the fact that these were all

22   being done secretly, not being disclosed to Clem in advance

23   or immediately afterwards, is a violation of his fiduciary

24   rights as a member.

25             THE COURT:  All right.  Thank you, Mr. Fornwald.

1          MR. FORNWALD:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          Anybody from the defendants want to have an

4     additional word?

5          MR. ASMUS:  Nothing from the D&Y defendants,

6     Your Honor.

7          MR. BROWN:  No thank you, Your Honor.

8          THE COURT:  All right.

9          MR. PFUTZENREUTER:  No, Your Honor, thanks.

10          THE COURT:  Thank you.  Mr. Fornwald, you haven't

11     convinced me yet, but I'm going to take it under advisement.

12     I want to review your arguments again.  I want to take a

13     look at the authorities again.  What I can tell everybody is

14     that the hearing before Magistrate Judge Elkins is canceled.

15     I'm canceling that.  And if I come to a different ruling on

16     this, then that will be reinstated, but you'll hear from the

17     Court in that regard.

18          But I will take it under advisement.  I do

19     appreciate the lawyering here and the arguments here.

20     Everybody was very well prepared and the briefing was also

21     very good, although it's hard to keep track of all of the

22     different entities.  I don't think I've ever seen as many

23     entities involved in one case, let alone in one family.  So

24     it's been really interesting that way and challenging.

25          So with that said, if there's nothing further, the

1  Court will stand adjourned.  I'll be taking it under

2  advisement.

3          THE COURTROOM DEPUTY:  All rise.

4          (Court adjourned at 3:27 p.m.)

5                      *     *     *

6

7

8      I, Erin D. Drost, certify that the foregoing is a

9  correct transcript from the record of proceedings in the

10 above-entitled matter.

11

12

13         Certified by:  s/Erin D. Drost
                           Erin D. Drost, RMR-CRR
14

15

16

17

18

19

20

21

22

23

24

25